UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

JEFFREY A. TYLER,

                Defendant.
_____

REPORT & RECOMMENDATION

11-CR-6083CJS

**PRELIMINARY STATEMENT**

By Order of Hon. Charles J. Siragusa, United States District Judge, dated May 2, 2011, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

Defendant Jeffrey A. Tyler ("Tyler") has been charged in one count of a seven-count superseding indictment returned against him and co-defendants Robert W. Moran, Jr. ("Moran"), James Henry McAuley, Jr. ("McAuley"), Gina Tata ("Tata"), Richard E. Riedman ("Riedman"), Timothy M. Stone ("Stone"), Richard W. Mar ("Mar"), Donna Boon ("Boon"), Gordon L. Montgomery ("Montgomery") and Paul S. Griffin[1] ("Griffin"). (Docket # 126). The first count of the superseding indictment charges McAuley, Mar, Boon, Riedman, Montgomery, Tyler and Griffin with conspiring between the years 2002 and 2010 to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846.[2] (*Id.* at 2).

---

[1] Griffin pled guilty to the charge against him and was sentenced on March 25, 2013. (Docket # 392).

[2] A full recitation of the charges in the superseding indictment may be found in this Court's Report and Recommendation dated November 26, 2013. (Docket # 441).

Currently pending before the Court is Tyler's motion to suppress statements,[3] as to which this Court conducted an evidentiary hearing on March 12, 2013. (Docket ## 345, 389, 395). For the reasons discussed below, I recommend that the district court deny Tyler's motion to suppress statements.

## FACTUAL BACKGROUND

This Court conducted an evidentiary hearing on March 12, 2013 concerning the circumstances surrounding Tyler's arrest and statements he made following that arrest. (Docket # 389).[4] During the hearing, the government offered testimony of two agents employed by the Federal Bureau of Investigation ("FBI"), David A. Knight ("Knight") and David E. Geist ("Geist"), and an investigator employed by the New York State Police, Mark Braun ("Braun"). (Tr. 4, 48, 59-60).

### I. Testimony of Knight

Knight testified that he had been employed as a special agent with the FBI for approximately six years. (Tr. 4). On February 23, 2012, Knight was assigned to execute an

---

[3] Tyler's omnibus motion also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, a bill of particulars, joinder in the pretrial motions of co-defendants, an audibility hearing, suppression of identification evidence, and severance. (Docket # 345). On November 26, 2013, this Court recommended that the district court deny Tyler's motion for severance. (Docket # 441). During oral argument on February 5, 2013, as a result of concerns raised by the government over early disclosure of the identity of a confidential informant, the parties agreed to defer an evidentiary hearing concerning the identification evidence until closer to trial. Specifically, the government agreed to file an affidavit describing the informant's prior contacts or interactions with Tyler. At that time, if Tyler continues to seek suppression of the identification evidence, this Court will hold an evidentiary hearing and issue a report and recommendation. Each of Tyler's remaining requests were either resolved by the parties or decided in open court by the undersigned on February 5, 2013. (Docket ## 370, 371).

[4] The transcript of the March 12, 2013 hearing shall be referred to as "Tr. ___." (Docket # 395).

arrest warrant for Tyler. (Tr. 5-6). According to Knight, that morning at approximately 8:00 a.m., he and two law enforcement officers arrived at 10 Algonquin Terrace in the City of Rochester to arrest Tyler.[5] (Tr. 5-8, 28-29). Knight and the officers were wearing tactical gear or uniforms, but Knight did not approach the building with his service weapon drawn. (Tr. 8, 29, 33).

Knight testified that he knocked on the door to the premises. (Tr. 8). According to Knight, after he knocked, an individual whom he referred to as "JC," answered the door. (*Id.*). Knight explained to JC that they were at the premises to execute an arrest warrant. (Tr. 8-9). Knight testified that JC allowed them to enter the premises and then called for Tyler. (*Id.*). Tyler appeared almost immediately after they entered. (Tr. 9, 32). Knight informed Tyler that they had a warrant for his arrest, that they needed to take him downtown and that everything would be explained to Tyler once they arrived downtown. (Tr. 9, 34). Tyler was initially upset and expressed disbelief, but was compliant with Knight's instructions. (Tr. 9-10, 34). Knight then handcuffed Tyler and escorted him outside and into a law enforcement vehicle. (Tr. 10-11). Knight testified that the entire encounter at 10 Algonquin Terrace lasted approximately five minutes. (Tr. 34).

Tyler was immediately transported to the FBI office by Knight and three other officers. (Tr. 11-12). According to Knight, they did not have any conversation with Tyler during the drive to the federal building. (Tr. 12, 34). When they arrived at the FBI office, Tyler was

---

[5] Knight testified that there were approximately six to ten additional law enforcement officers on the corner of the street, in the general vicinity of the premises, but that only he and two other officers approached the premises. (Tr. 30, 43-44).

taken into an interview room by Knight and Geist. (Tr. 12). At that time, the agents removed Tyler's handcuffs. (Tr. 13).

Knight briefly left Tyler and Geist in the interview room while he collected case-related documents. (Tr. 13-14). When he returned, he provided Tyler with a copy of the arrest warrant and explained the charges against him. (Tr. 14). According to Knight, he explained that the charge was very serious and may have informed him that the potential sentencing guidelines range was five-to-forty years. (Tr. 14, 46).

After that discussion, at approximately 8:17 a.m., Knight provided Tyler with a copy of a *Miranda* rights form.[6] (Tr. 14; Government's Exhibit ("G. Ex.") 1). Knight proceeded to read and point to each of the rights on the form. (Tr. 14-15). According to Knight, Tyler appeared to follow along as Knight read the rights; he never indicated that he did not understand the rights. (Tr. 15, 44). Knight testified that he read each of the rights to Tyler, but did not read

---

[6] The "Advice of Rights" form provided:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
>
> I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

(G. Ex. 1).

4

aloud the final statement on the form.[7] (Tr. 19, 36-37). Instead, according to Knight, he asked Tyler if he was willing to sign the form. (Tr. 15). Tyler responded that he would not sign anything. (Tr. 16). At that point, according to Knight, he asked Tyler if he was willing to speak with Knight. (*Id.*). In substance, Tyler responded that the agents could ask him anything they wanted, but that Tyler would not know the answers to any questions. (Tr. 16, 37). Knight testified that he indicated on the form that Tyler "verbally agreed," completed the location, time and date portions of the form, and executed the form. (Tr. 15, 17; G. Ex. 1). The form was completed at 8:21 a.m. (G. Ex. 1).

At that point, Braun entered and Geist left the interview room. (Tr. 22). Knight testified that he informed Braun of what had transpired, including that he had informed Tyler of his rights and that Tyler had agreed to answer questions. (Tr. 22-23). Tyler did not dispute Knight's characterization of their interaction. (Tr. 23). At that point, Knight and Braun began to interview Tyler. (*Id.*). The interview lasted approximately twenty minutes. (Tr. 24, 42-43). Knight testified that he was present for the entire interview except for a brief time when he stepped out of the interview room. (Tr. 24-25). According to Knight, Tyler did not appear intoxicated or under the influence of any substance. (Tr. 11). Further, Knight testified that Tyler never requested to speak to an attorney or to contact anyone by telephone, nor did he indicate that he did not wish to speak to them. (Tr. 25-26, 35). In addition, Knight testified that Tyler was not threatened during the interview. (Tr. 26).

---

[7] The final statement provides: "I have read this statement of my rights and I understand what my rights are. At this time I am willing to answer questions without a lawyer present." (G. Ex. 1).

## II. Testimony of Geist

Geist testified that he had been employed as a special agent with the FBI for approximately three and a half years. (Tr. 48). On February 23, 2012, Geist was assigned to execute an arrest warrant for Tyler. (Tr. 49, 57). According to Geist, although he accompanied law enforcement personnel to 10 Algonquin Terrace, he remained in a car during the arrest and did not approach the premises. (Tr. 49, 54-55). Geist was in the vehicle that transported Tyler to the FBI office after Tyler's arrest. (Tr. 50). According to Geist, during the transportation, none of the law enforcement officers engaged in any conversation with Tyler, and Tyler did not request an attorney during the transport. (Tr. 50, 54-55).

After arriving at the FBI office, Geist and Knight escorted Tyler to an interview room. (Tr. 50-51). According to Geist, his role was to wait with Tyler in the interview room until Braun arrived to conduct the interview. (Tr. 50-51, 56). Geist testified that Knight left the room briefly, leaving him alone with Tyler. (Tr. 51). During that time, Geist did not speak to Tyler, and Tyler did not ask to use a telephone or to speak with an attorney. (Tr. 51-52, 55).

According to Geist, after Knight returned to the interview room, Tyler was informed of the charges on which he was arrested, advised of his *Miranda* rights, and was asked whether he was willing to speak with the agents. (Tr. 57-58). Tyler responded that he was willing to answer questions, but that he would not be able to provide answers because did not have any knowledge of the charges. (*Id.*). Shortly after this conversation, Braun arrived and relieved Geist. (Tr. 56).

### III. Testimony of Braun

Braun testified that he had been an employee of the New York State Police for approximately twenty years and had worked as an investigator for approximately the last ten years. (Tr. 59-60, 65). On February 23, 2012, Braun was assigned to assist in the post-arrest interview of Tyler. (Tr. 60-61). Braun's first interaction with Tyler that day occurred when Braun entered the FBI interview room where Tyler was placed after his arrest. (Tr. 61, 64-65). At the time, Geist, Knight and Tyler were in the room. (Tr. 62).

After Braun entered the room, Geist left. (*Id.*). According to Braun, Knight informed him that he had advised Tyler of his *Miranda* rights and that Tyler had agreed to talk to Knight. (*Id.*). According to Braun, Tyler responded that he was willing to talk, but that he did not have any pertinent information. (Tr. 62-63). Knight and Braun proceeded to interview Tyler. (Tr. 63). Braun testified that during the interview, Knight briefly left the interview room. (*Id.*). During that time, Tyler did not request to speak with an attorney or to use a telephone. (Tr. 64).

### IV. Tyler's Affidavit

In support of his suppression motion, Tyler submitted an affidavit stating that he was taken into custody by state and federal law enforcement personnel on the morning of February 23, 2012. (Docket # 373 at ¶ 3). According to his affidavit, Tyler repeatedly requested an attorney and the opportunity to make a telephone call. (*Id.* at ¶ 4). Tyler stated that his requests were denied and that he was not permitted to speak with his attorney until later that afternoon. (*Id.*). According to Tyler, he was not "adequately" advised of his *Miranda* rights and

7

he never agreed, either verbally or in writing, to waive his rights or to be questioned without an attorney present. (*Id.* at ¶¶ 5-6).

**DISCUSSION**

I. **Tyler's Fifth Amendment Rights**

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. Accordingly, "[e]ven absent the accused's invocation of [his rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012). To establish a valid waiver, the government must prove by a preponderance of the evidence that (1) the waiver was "knowing" – namely, that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

8

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

Here, the government does not contest that Tyler was in custody at the time that he made the statements in question. Rather, the question is whether Tyler was advised of and validly waived his *Miranda* rights prior to providing the statements. The record before this Court, including the testimony of Knight, Geist and Braun, which I credit, demonstrates that Tyler was advised of his *Miranda* rights and voluntarily agreed to waive them. Specifically, Tyler first encountered law enforcement at 10 Algonquin Terrace in Rochester. Tyler was immediately informed that he was under arrest based upon a federal warrant and transported to

9

the federal building, where he was placed in an interview room. The entire encounter at 10 Algonquin Terrace lasted only five minutes.

Approximately twenty minutes after the initial arrest, Knight informed Tyler of the charges against him and advised him of his rights by reading them verbatim from a *Miranda* rights form. Knight testified that Tyler appeared to follow along on the written form as he read each right and never indicated he did not understand his rights. Further, Knight testified that Tyler did not appear intoxicated or otherwise under the influence of any substance and that he remained calm throughout the recitation of the charges. (Tr. 11, 22). Although Tyler refused to sign the waiver of rights form, that alone does not preclude a finding of a valid waiver. *United States v. Plugh*, 648 F.3d at 127 (finding valid waiver even though defendant initially refused to execute a waiver of rights form); *United States v. Chisholm*, 2009 WL 29313, *3 (E.D.N.Y. 2009) ("[t]he refusal to sign a waiver form does not preclude a finding of waiver where a defendant indicates a willingness to answer questions") (citing *United States v. Spencer*, 995 F.2d 10, 12 (2d Cir.), *cert. denied*, 510 U.S. 923 (1993)). In response to Knight's question regarding whether he was willing to speak to the agents, Tyler expressly waived his *Miranda* rights by telling the agents that they could ask him any questions they desired, even though he claimed he would be unable to answer those questions.

Following Tyler's waiver, Knight and Braun interviewed him. The interview lasted approximately twenty minutes. Knight, Braun and Geist all testified that during the entire encounter with Tyler on February 23, 2012, he never requested the assistance of counsel, nor requested permission to use the telephone. On this record, I find that Tyler knowingly and voluntarily waived his *Miranda* rights prior to making any statements to law enforcement.

## II. Tyler's Sixth Amendment Rights

A defendant's right to counsel under the Sixth Amendment attaches "at the 'initiation of adversary judicial proceedings,' such as the filing of an indictment." *United States v. Yousef*, 327 F.3d 56, 140 (2d Cir.) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984); *United States v. Abdi*, 142 F.3d 566, 569 (2d Cir. 1998)), *cert denied*, 540 U.S. 933 (2003); *see Fellers v. United States*, 540 U.S. 519, 523 (2004) (Sixth Amendment is "triggered 'at or after the time that judicial proceedings have been initiated'") (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)). "Once the right has attached, the Sixth Amendment renders inadmissible in the Government's case-in-chief statements elicited by the Government outside the presence of a defendant's counsel that are not accompanied by a waiver of this right." *United States v. Yousef*, 327 F.3d at 140 (citing *United States v. Henry*, 447 U.S. 264, 273-74 (1980)). As reiterated recently by the Supreme Court, "[a]n accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents ... deliberately elicited from him after he had been indicted and in the absence of his counsel." *Fellers v. United States*, 540 U.S. at 523 (alterations in original) (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964)). This Sixth Amendment "deliberate-elicitation" standard is distinguishable from the "custodial-interrogation" standard utilized in a Fifth Amendment analysis. *Id.* at 524.

It is equally well-established, of course, that a defendant may validly waive his Sixth Amendment rights. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("[o]ur precedents . . . place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent"); *Patterson v. Illinois*,

11

487 U.S. 285, 296 (1988) ("As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one"); *Yousef*, 327 F.3d at 140 ("It is settled law, however, that the attachment of the Sixth Amendment right to counsel, by itself, does not preclude a defendant from validly waiving his right to counsel").

Tyler's Sixth Amendment rights had attached at the time of his interview. The indictment charging Tyler was returned and filed on February 16, 2012 (Docket # 126); the arrest and interview occurred approximately one week later, on February 23, 2012 (Tr. 5-6). Accordingly, the sole question before this Court is whether Tyler had validly waived his Sixth Amendment rights prior to making the challenged statements. I find that he had.

As discussed more fully above, Knight advised Tyler of his constitutional rights by reading verbatim from a written *Miranda* form. That form specifically advised Tyler that he had the right to talk to an attorney before questioning and to have an attorney present. (G. Ex. 1). Tyler was also advised that an attorney would be appointed for him if he could not afford one and that he had the right to stop the questioning at any time if he decided that he desired the assistance of counsel. (G. Ex. 1). Although Tyler refused to sign the form and indicated that he did not have any relevant information, he verbally indicated to Knight that he was willing to speak to the agents concerning the investigation.

On this record, I find that Tyler was adequately advised of his Sixth Amendment right to counsel and that the government has satisfied its burden of demonstrating that Tyler knowingly and voluntarily waived his constitutional rights and agreed to speak with the agents.

*See Yousef*, 327 F.3d at 142 (statements made by defendant after indictment were not obtained in violation of the Sixth Amendment where the defendant had received *Miranda* warnings, had voluntarily waived those rights and had not invoked his right to counsel). Further, I credit the testimony of Knight, Braun and Geist that Tyler never requested an attorney after he was advised of and waived his *Miranda* rights. Accordingly, it is my recommendation that Tyler's motion to suppress statements on the grounds that they were made in violation of his Sixth Amendment rights be denied.

## **CONCLUSION**

For the reasons stated above, I recommend that the district court deny Tyler's motion to suppress statements made on February 23, 2012. (Docket # 345).

      *s/Marian W. Payson*
      MARIAN W. PAYSON
      United States Magistrate Judge

Dated: Rochester, New York
      November  27 , 2013

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[8]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                              *s/Marian W. Payson*
                                              MARIAN W. PAYSON
                                             United States Magistrate Judge

Dated: Rochester, New York
       November  27 , 2013

---

[8] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).